311 Ga. 123
FINAL COPY


S20A1520.  MOSS v. THE STATE.


WARREN, Justice.

Jermontae Moss was convicted of felony murder, possession of a firearm during the commission of a crime, and theft by receiving stolen property in connection with the shooting death of Jose Marin.[1]

---

[1] The crimes were committed on September 22, 2011.  On November 29, 2011, a Houston County grand jury indicted Moss for three counts of felony murder, one count each of attempted armed robbery, aggravated battery, and aggravated assault, three counts of possession of a firearm during the commission of a crime, and one count each of theft by receiving stolen property and carrying a concealed weapon.  At a trial held from October 22 to 24, 2012, the State withdrew the charge of carrying a concealed weapon; a jury found Moss guilty of all the remaining counts.  On October 25, 2012, the trial court sentenced Moss to life in prison without the possibility of parole ("LWOP") for felony murder predicated on armed robbery, a consecutive term of five years for a firearm count predicated on attempted armed robbery, and a concurrent term of ten years for the theft count.  The trial court purported to merge the remaining counts for sentencing purposes.  Moss timely filed a motion for new trial on November 5, 2012, which he amended through new counsel on March 16, 2018.  In separate orders entered on September 13, 2019, the trial court denied the amended motion for new trial but resentenced Moss to LWOP for felony murder predicated on aggravated battery, a consecutive term of five years for a firearm count predicated on aggravated battery, and a concurrent term of ten years for the theft count.  The remaining counts were merged for sentencing purposes, vacated by operation of law, or vacated by agreement of the parties.  Moss timely filed a notice of appeal on October 9, 2019.  The case was docketed in this Court to the August 2020 term and submitted for a decision on the briefs.

On appeal, Moss contends that his trial counsel provided constitutionally ineffective assistance and that the trial court erred in sentencing Moss — a 17-year-old juvenile at the time of the crimes — to life in prison without the possibility of parole ("LWOP") for murder. Neither of Moss's contentions has merit, so we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Moss's trial showed that Marin was the owner of Marin Mexican Food Store in Warner Robins and that, at approximately 9:30 p.m. on September 22, 2011, Marin and Javier Moreno were unloading merchandise from a truck behind the store. While they worked, a man approached Marin and Moreno with a gun and said, "Hey, give me your money." Marin explained that they had no money as he slowly put a case of tortillas down on the ground. The man then shot Marin in the abdomen. Marin attempted to shoot back with his own gun, but the perpetrator ran away in the direction of Carl Vinson Parkway.

Moreno called 911 and described the perpetrator as a "black male, skinny . . . in a white shirt and black [exercise] pants." Moreno

2

also stated that the perpetrator had a red bandana covering his face and wore a hair net over the rest of his head. When police arrived at the scene, an officer was unable to find a pulse for Marin, who was transported to the hospital and later died. Police recovered a .45-caliber bullet and a .45-caliber Blazer brand casing at the scene.

Sergeant Todd Rountree responded to the 911 call at 9:53 p.m. and drove to the mobile home park between Marin's store and Carl Vinson Parkway. Rountree spotted Moss, who matched the description Moreno provided in his 911 call, holding a large object in his waistband. During a pat-down of Moss, Rountree discovered that Moss had a loaded .45-caliber Taurus pistol that had apparently slipped down inside his pants to the area of his right knee. Rountree eventually was able to move the pistol down the leg of the pants and remove it from the bottom of the pants. Forensic analysis later showed that the pistol Moss was carrying — which previously had been reported as stolen — fired the bullet and discharged the casing recovered from the crime scene. Moss had a hair net in his pocket, but a red bandana was not recovered.

After police drove Moreno to the scene where Rountree had arrested Moss, Moreno saw Moss and identified his shirt and pants as the clothes the robber was wearing when he shot Marin. Moreno noted that Moss's build was the same as the shooter's, but he did not recognize Moss's face or hair as matching that of the shooter. Police transported Moss to the police station and later collected his clothing, which included black jogging pants, gray pants, red shorts, and a white t-shirt. After advising Moss of his rights, police interviewed him. Moss stated that he had possessed the pistol for about two weeks, and no one else had possessed it during that time. An officer swabbed Moss's hands for gunshot residue ("GSR") at the station, but a later test of the "hand wipings" that had been collected did not reveal the presence of GSR on Moss's hands. The GSR results were not presented at trial.

At trial, the State presented testimony that Moss had committed a previous crime in the mobile home park where police located Moss after Marin's shooting that was similar to the attempted robbery that resulted in Marin's shooting. Specifically,

4

the State presented evidence that Neftally Corado had been watching television alone in his mobile home with the door open on the night before Marin's attempted robbery when a black man walked in and demanded money. The man then shot Corado and fled. Corado survived and identified Moss in court as the shooter. Additionally, the State presented evidence that a bullet casing found in Corado's mobile home after the shooting was fired from the pistol Moss was carrying on the night of Marin's murder.

Although Moss does not contest the legal sufficiency of the evidence supporting his convictions, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was easily sufficient to authorize a rational jury to find Moss guilty beyond a reasonable doubt of felony murder and the related count of possession of a firearm during the commission of a crime. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).[2]

---

[2] The sufficiency analysis is much less clear with respect to Moss's conviction for theft by receiving. But as noted, he raises no challenge on appeal

2. Moss contends that he was denied the effective assistance of trial counsel in two ways. We conclude that Moss has failed to show that his trial counsel was constitutionally ineffective.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

_____

to the sufficiency of the evidence supporting that conviction, and — particularly given our holding in Division 3 affirming Moss's sentence of life in prison without the possibility of parole for murder — his concurrent ten-year sentence for theft by receiving has no practical effect. And although our Court — for the few remaining cases that were docketed to our August term of court —generally will continue our practice of reviewing sua sponte the sufficiency of the evidence in non-death penalty cases, we elect not to do so with respect to Moss's theft by receiving conviction here. See *Davenport v. State*, 309 Ga. 385, 392, 399 (846 SE2d 83) (2020) (recognizing that this Court's "long practice of deciding unraised sufficiency claims" in murder cases "has been purely an exercise of discretion; no law requires it" and announcing the end of our practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that began in December 2020, which includes cases docketed on or after August 3, 2020). Indeed, for the reasons explained in *Davenport*, sua sponte sufficiency review is particularly fraught where, as here, the question is a close one and the issue is not briefed by the parties. See id. at 397-398 (emphasizing the importance of the adversarial process and noting that the risk that the Court will make mistakes in deciding an issue "is at its highest when we consider an issue that no party has briefed or argued. And this is doubly so when the issue is especially record-intensive, as are almost all sufficiency issues"). See also id. at 398 (acknowledging that "[m]any reversals that do occur involve only a sentence for a lesser offense that has no practical effect, given that the defendant has also received a sentence of life in prison or life without parole for the murder"). Accordingly, for the reasons we discussed in *Davenport*, we decline to exercise our discretion to review the sufficiency of the evidence supporting Moss's conviction for theft by receiving and therefore leave that conviction undisturbed.

6

deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington,* 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Moss contends that his trial counsel provided ineffective assistance by failing to present evidence that a GSR test revealed no GSR on Moss's hand and that someone else's fingerprints had been

7

found on the magazine of the pistol that Moss was carrying on the night of Marin's murder (and that was later shown to be the murder weapon).

Prior to trial, the State provided trial counsel with a GBI report showing that a test conducted by an analyst did not reveal the presence of GSR on Moss's hands. The State also gave trial counsel a GBI report showing that a single fingerprint was found on the magazine of the pistol Moss was carrying when he was arrested on the night of Marin's murder, that Moss had been excluded as the source, and that no fingerprint was found anywhere else on the pistol. At trial, trial counsel did not introduce either of the GBI reports into evidence. However, he elicited testimony that the pistol Moss was carrying was processed for fingerprints and that a GSR test had been performed on Moss, and in closing argument argued that the State did not present the GSR or fingerprint results because the results did not link Moss to the shooting. In its order on Moss's motion for new trial, the trial court found that trial counsel could have made a strategic decision not to introduce the results of the

forensic testing into evidence, and instead to argue "that the State wholly failed to produce any results of this testing." The trial court further found that, even if the failure to introduce the two GBI reports into evidence could be considered deficient performance, "it is apparent . . . that, given that defense counsel emphasized to the jury the lack of any testing results that incriminated Defendant, submission of these two reports would not have likely resulted in a different outcome."

Pretermitting whether trial counsel was constitutionally deficient in his failure to introduce the GSR and fingerprint reports, Moss has failed to show a reasonable probability that, in the absence of counsel's deficient performance, the outcome of Moss's trial would have been different. See *Strickland*, 466 U.S. at 694. Indeed, the GSR and fingerprint reports themselves would not have been especially helpful to the defense. First, the presence of someone else's fingerprint on the pistol magazine — even coupled with the absence of Moss's fingerprints—would not necessarily exclude Moss as the shooter, especially in light of the fact that the pistol was

discovered inside Moss's pants.  Similarly, the report on the GSR

test results specifically warned — consistent with certain trial

testimony — that the absence of GSR particles from Moss's hands

"does not eliminate the possibility that the subject discharged a

firearm."  And second, the admission of the GSR and fingerprint

reports were duplicative of other evidence and argument presented

at trial.  To that end, testimony at trial showed that Moss's hands

and the pistol he was carrying were tested and examined for the

presence of GSR and fingerprints, and trial counsel emphasized in

argument that the State did not present the results because they did

not link Moss to the shooting.  Because Moss has failed to show a

reasonable probability that the outcome of his trial would have been

different in the absence of his counsel's allegedly deficient

performance, his claim of ineffective assistance fails.  See *Parker v.

State*, 309 Ga. 736, 745 (848 SE2d 117) (2020) (recognizing that a

concession about a disputed fact made during trial counsel's closing

argument can make it unlikely that her allegedly deficient

performance with respect to the evidentiary issue affected the

10

outcome of the trial); *Haney v. State*, 305 Ga. 785, 790 (827 SE2d 843) (2019) (recognizing that duplicative testimony can show that an alleged deficiency regarding an evidentiary matter did not affect the result of the trial).

(b) Moss also contends that his trial counsel was constitutionally ineffective for failing to demur to the aggravated battery count of the indictment, as well as the felony murder and firearm counts that were predicated on aggravated battery. Under OCGA § 16-5-24 (a):

> A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.

Here, the aggravated battery count charged that Moss "did maliciously cause bodily harm to the person of Jose Marin by depriving him of a member of his body, to wit: shot Jose Marin in the lower abdomen with a firearm causing serious bodily injury resulting in death." Moss claims that this count failed to allege that Moss "deprived" Marin of any particular member of his body and

11

that trial counsel was ineffective for failing to seek a demurrer. Alternatively, Moss argues that even if the indictment could be read to allege that Marin was deprived of his abdomen, the abdomen is not a "member" of the body. The trial court concluded that counsel did not provide ineffective assistance by failing to file a demurrer on the aggravated battery and related counts because the abdomen is a member of the body and Marin was indeed deprived of it.

As an initial matter, Moss's ineffective assistance claim is moot as to the aggravated battery count itself because that offense merged into his felony-murder conviction. But Moss's claim that the alleged defect in the indictment also subjected the related felony murder and firearm counts to demurrer is not moot, because both of those counts were predicated on the aggravated battery and resulted in convictions. See *Hinkson v. State*, 310 Ga. 388, 393 (850 SE2d 41) (2020) (although the defendant was convicted only of felony murder based on aggravated assault and his complaints about all other charges in the indictment were moot, this Court nevertheless considered his contentions about alleged defects in the count

12

charging the predicate felony of aggravated assault).

As for Moss's first argument — that the aggravated battery count failed to allege that Moss deprived Marin of any particular member of his body — we disagree. The indictment used the traditional phrase "to wit" to explicitly link its general allegation that Moss "cause[d] bodily harm to the person of Jose Marin by depriving him of a member of his body" to its more specific allegation that Moss "shot Jose Marin in the lower *abdomen* with a firearm causing serious bodily injury resulting in death." (Emphasis supplied.) See Black's Law Dictionary (9th ed. 2009) (defining "to wit" as "[t]hat is to say; namely"). And in any event, the indictment necessarily implied as much because Marin's abdomen was the only location on his body specified and because no other bodily member was mentioned. See, e.g., *Subar v. State*, 309 Ga. 805, 809 (848 SE2d 109) (2020) ("The allegation that [the defendant] entered [the victim]'s home without authority and with the intent to commit various felonies necessarily implied that [the defendant] intended to commit the underlying crimes inside the residence."); *Jordan v.*

13

*State*, 307 Ga. 450, 455 (836 SE2d 86) (2019) ("The allegation that the house 'was the dwelling house of . . . [the victim]' necessarily implied that he had the authority to be present therein."). Because the aggravated battery count sufficiently alleged that Marin's abdomen was the member of his body of which he was deprived as a result of Moss's action, a demurrer based on Moss's first argument would not have been successful, and Moss "cannot show deficient performance, as counsel cannot be ineffective for failing to make a meritless motion." *Subar*, 309 Ga. at 809 (citation and punctuation omitted).

As for Moss's second argument — that even if the indictment could be read to allege that Marin was deprived of his abdomen, the abdomen is not a "member" of the body — Moss conceded during the hearing on his motion for new trial that Georgia courts have "not addressed this particular body part" in the context of aggravated battery, and we have not found any case that has done so. This Court has generally defined "member" in OCGA § 16-5-24 (a) as a "bodily part or organ," *Mitchell v. State*, 238 Ga. 167, 168 (231 SE2d

14

773) (1977), and Georgia courts have construed "member" to include an eye, jaw, brain, spleen, ear, leg, shoulder, finger, genital organ, tooth, rectum, elbow, nose, and wrist.[3] But our research has not uncovered Georgia cases explaining or offering examples of body parts or organs that do *not* constitute a bodily "member." Because existing precedent does not resolve whether "abdomen" is included in the definition of bodily "member," Moss cannot show that trial counsel's failure to file a demurrer claiming that the abdomen is not a bodily "member" amounted to deficient performance. See *Griffin v. State*, 309 Ga. 516, 520 (847 SE2d 168) (2020) (Where "we have not yet squarely decided" an issue, "trial counsel's failure to raise a

---

[3] See *Mitchell*, 238 Ga. at 168 (eye); *Baker v. State*, 245 Ga. 657, 667 (266 SE2d 477) (1980) (jaw); *Miller v. State*, 275 Ga. 730, 731-732 (571 SE2d 788) (2002) (brain); *Jarrard v. State*, 152 Ga. App. 553, 555 (263 SE2d 444) (1979) (spleen); *Drayton v. State*, 167 Ga. App. 477, 477 (306 SE2d 731) (1983) (ear); *Howard v. State*, 173 Ga. App. 585, 585 (327 SE2d 554) (1985) (leg); *Terry v. State*, 188 Ga. App. 748, 748 (374 SE2d 235) (1988) (shoulder); *Ganas v. State*, 245 Ga. App. 645, 646 (537 SE2d 758) (2000) (finger); *Byrd v. State*, 251 Ga. App. 83, 84 (553 SE2d 380) (2001) (genital organ); *Rivers v. State*, 255 Ga. App. 422, 423-424 (565 SE2d 596) (2002) (tooth); *Parham v. State*, 270 Ga. App. 54, 55 (606 SE2d 79) (2004) (rectum); *Walls v. State*, 283 Ga. App. 560, 561 (642 SE2d 195) (2007) (elbow); *Jones v. State*, 283 Ga. App. 631, 633 (642 SE2d 331) (2007) (nose); *Goss v. State*, 289 Ga. App. 734, 736 (658 SE2d 168) (2008) (wrist).

15

novel legal argument does not constitute ineffective assistance of counsel.") (citation and punctuation omitted); *Rhoden v. State*, 303 Ga. 482, 486 (813 SE2d 375) (2018) ("[T]here is no requirement for an attorney to prognosticate future law in order to render effective representation. Counsel is not obligated to argue beyond existing precedent.") (citations and punctuation omitted).

3. Moss contends that the trial court was not authorized to sentence Moss, who was a 17-year-old juvenile when he committed the crimes, to LWOP for murder. We disagree.

(a) Pointing to excerpts from cases like *Veal v. State*, 298 Ga. 691 (784 SE2d 403) (2016), and *Miller v. Alabama*, 567 U.S. 460, 472-473 (132 SCt 2455, 183 LE2d 407) (2012), Moss first argues that the trial court was required to make a specific determination that Moss *himself* (as opposed to his conduct) was "irreparably corrupt," *Veal*, 298 Ga. at 702 (emphasis omitted), and that the trial court failed in its obligation to make such a determination here.[4] See

[4] *Miller* was decided four months before Moss's original sentence was entered, and the trial court did not make a determination about whether

16

*Miller*, 567 U.S. at 472-473 ("Deciding that a 'juvenile offender forever will be a danger to society' would require 'making a judgment that he is incorrigible.'") (quoting *Graham v. Florida*, 560 U.S. 48, 72 (130 SCt 2011, 176 LE2d 825) (2010)) (punctuation omitted).

The record shows, however, that the trial court made the determinations required by United States Supreme Court case law and this Court's precedents interpreting it. Specifically, in *Miller*,

> the [United States] Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" As a result, the Court required "a sentencer . . . to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," and it specifically noted that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles."

*Raines v. State*, 309 Ga. 258, 260 (845 SE2d 613) (2020) (quoting *Miller*, 567 U.S. at 480, 489). And in *Veal*, this Court concluded that,

---

Moss's crimes reflected irreparable corruption or permanent incorrigibility before entry of Moss's original LWOP sentence. After Moss's amended motion for new trial was filed, Moss and the State agreed that Moss was entitled to a new sentencing hearing for the trial court to make such a determination before Moss could be sentenced to LWOP for crimes committed as a juvenile.

under *Miller* (as refined by *Montgomery v. Louisiana*, 570 U.S. 190 (136 SCt 718, 193 LE2d 599) (2016)), "a trial court must make a 'distinct determination' that the defendant is an 'exceptionally rare' juvenile who is 'irreparably corrupt' or 'whose crimes reflect permanent incorrigibility' before sentencing a juvenile convicted of murder to life without parole." *Raines*, 309 Ga. at 261 (emphasis omitted) (quoting *Veal*, 298 Ga. at 701-703).

Indeed, the trial court offered ample support for its conclusion that Moss's "behavior does not reflect an immature youth who merely makes impulsive and reckless decisions on occasion, or has an underdeveloped sense of responsibility; rather, it betrays one who is deliberate, malevolent, and exhibits a depraved heart" and that Moss's crimes do not reflect "unfortunate yet transient immaturity." (Citation and punctuation omitted.) It reviewed Moss's juvenile history, including (among other things) prior arrests for burglary and obstruction, prior possession of drugs, and admitted involvement with the "Bloods" gang. It determined that Moss — who was on probation when he shot Marin — shot a different person

18

(Corado) the night before Marin's murder during a separate attempted robbery, and noted that Moss ultimately pleaded guilty to criminal attempt to commit murder for that offense. And it concluded that Moss's "criminal behavior has escalated during the last several years," that Moss "[s]how[ed] no hesitation, remorse, or reflection whatsoever" when he shot and killed Marin, and that Moss "appeared to be shooting just for the sake of killing." Based on these things, and after acknowledging that it must consider Moss's "youth and its attendant characteristics, along with the nature of his crime," *Miller*, 567 U. S.465, the trial court resentenced Moss to LWOP, concluding that Moss's "*actions* reflect irreparable corruption" (emphasis in original), his "behavior exhibits an irretrievable depravity which appears to foreclose any reasonable prospects for rehabilitation," and "[h]e thus falls into that 'rarest of juvenile offenders . . . whose crimes reflect permanent incorrigibility; whose crimes reflect irreparable corruption . . . .'" (Quoting *Veal*, 298 Ga. at 702 (emphasis omitted)).

It is true, as Moss points out, that at one point in its lengthy

19

order the trial court also opined on the role of the "Divine" in the ultimate judgment of a human being:

> This Court cannot find, in this case or in any other, that the Defendant *himself* is "irretrievably corrupt" or "permanently incorrigible." And it is this Court's firm opinion that no court at any level is ever able to make such a determination; it is beyond human capacity. Only a Divine Judge could look into a person and determine that he is permanently and irretrievably corrupt; that he has reached a state from which there is no return, no hope of redemption, no hope of any restoration.

(Emphasis in original.) But we do not view *Miller* or *Montgomery* — or cases from this Court applying *Miller* and *Montgomery*, such as *Veal*, *White*, and *Raines* — as requiring the trial court to conduct a metaphysical assessment of a juvenile defendant. Given the express determinations contained in the trial court's order and summarized in part above, we cannot say that the trial court's additional observations about the metaphysical — especially when viewed in the full context of the court's order — somehow rendered the trial court's analysis erroneous.[5]

---

[5] Moss also contends that a jury, and not a judge, must find him irreparably corrupt for an LWOP sentence to be imposed. He correctly

(b) Moss also contends that he cannot be sentenced to LWOP because OCGA § 17-10-16 (a) prohibits the imposition of an LWOP sentence on a juvenile.  We disagree.

OCGA § 17-10-16 (a) provides:

> Notwithstanding any other provision of law, a person who is convicted of an offense . . . for which the death penalty may be imposed under the laws of this state may be sentenced to death, imprisonment for life without parole, or life imprisonment as provided in Article 2 of this chapter.

Moss reasons that the portion of OCGA § 17-10-16 (a) that permits an LWOP sentence when a person is "convicted of an offense . . . for which the death penalty may be imposed" is not satisfied here because the death penalty may not be imposed upon juveniles.  Moss cites no direct authority for this analysis,[6] but necessarily implies

concedes, however, that this Court recently held otherwise in *Raines*, 309 Ga. at 268-273.

[6] Moss analogizes to *State v. Velazquez*, 283 Ga. 206 (657 SE2d 838) (2008), to argue that even when one statute (such as OCGA § 16-5-1 (e) (1) here) provides LWOP as a sentencing option, OCGA § 17-10-16 (a) prevents imposition of that sentence if either Georgia statutory law or United States Supreme Court case law dictate that the death penalty cannot be imposed for that offense.  In *Velazquez*, a 4-3 majority of this Court held that a person convicted of rape could not be sentenced to LWOP — which was enumerated as an authorized sentence in the rape statute, see OCGA § 16-6-1 (b) — where

that the "notwithstanding any other provision of law" portion of OCGA § 17-10-16 (a) references, and indeed grafts into the statute, the United States Supreme Court's Eighth Amendment jurisprudence. See, e.g., *Roper v. Simmons*, 543 U.S. 551, 578 (125 SCt 1183, 161 LE2d 1) (2005) (holding that the Eighth Amendment prohibits the death penalty for juveniles).

This interpretation, however, ignores the complete statutory text "read . . . in its most natural and reasonable way." *Blackwell v. State*, 302 Ga. 820, 828 (809 SE2d 727) (2018) (in construing a statute, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would") (citation and punctuation omitted). To that end, OCGA § 17-10-16 (a)'s reference to an offense "for which the death penalty

---

the State did not file a notice of intent to seek the death penalty. See *Velazquez*, 283 Ga. at 206-209. The *Velazquez* majority reasoned that under OCGA § 17-10-32.1 and other law in effect at that time, an LWOP sentence was not available if the death penalty constitutionally could not be imposed and thus prevented the State from filing a notice of intent to seek the death penalty. See *Velazquez*, 283 Ga. at 208-209. But Georgia law no longer requires as a prerequisite for an LWOP sentence that the State file a notice of intent to seek the death penalty, and OCGA § 17-10-32.1 has since been repealed. *Velazquez* therefore has no bearing on our analysis of OCGA § 17-10-16 (a).

may be imposed *under the laws of this state*" (emphasis supplied) is most naturally understood to mean an offense for which the governing Georgia statute lists the death penalty as a sentencing option. See *Neal v. State*, 290 Ga. 563, 569 (722 SE2d 765) (2012) (Hunstein, C. J., concurring, joined by all other Justices) (interpreting constitutional language identifying cases in which a death sentence "could be imposed" to include all life-imprisonment murder cases because, under the homicide statute, "murder is clearly a crime in which a defendant, upon conviction, can be punished by death as compared to other crimes"); *Atlanta & W. P. R. Co. v. Hemmings*, 192 Ga. 724, 728 (16 SE2d 537) (1941) (interpreting phrase "any law of the State" in a constitutional provision to mean a "legislative enactment" and not a court decision). Applied here, we conclude that OCGA § 17-10-16 (a) is satisfied because OCGA § 16-5-1 (e) (1) enumerates death as a potential sentence for murder.[7] To hold otherwise would import into

---

[7] OCGA § 16-5-1 (e) (1) provides: "A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or

23

a Georgia statute an evolving body of United States Supreme Court case law when the text says nothing about constitutional limitations in general or juveniles in particular. Cf. *Raines*, 309 Ga. at 265 ("The prohibition against imposing the death penalty on juveniles and the requirement that a specific determination of irreparable corruption be made before imposing a sentence of LWOP on a juvenile are *constitutional* constraints imposed by the Supreme Court's interpretation of the Eighth Amendment — not by any Georgia statute.") (emphasis in original).

Perhaps in anticipation of this conclusion, Moss also argues that if we do not adopt his interpretation of OCGA § 17-10-16 (a), the statute will be rendered "mere surplusage" because its only possible meaning is "that those who cannot constitutionally be sentenced to death may also not be sentenced to life without parole." But that is not so. Although it is true that the General Assembly has made a number of changes to the statutory scheme for murder

---

by imprisonment for life."

—including repealing other statutes pertaining to LWOP sentences and adding OCGA § 16-5-1 (e) (1), which enumerates LWOP as a potential sentence for persons convicted of murder — OCGA § 17-10-16 (a) still retains meaning. Indeed, by its plain terms, OCGA § 17-10-16 (a) authorizes death, LWOP, and life in prison as sentences for persons convicted of offenses for which the death penalty may be imposed. And even to the extent OCGA § 16-5-1 (e) (1) controls sentencing for the specific offense of murder, OCGA § 17-10-16 (a) still serves as a general background rule that authorizes LWOP (as well as death and life in prison) sentences for other offenses that meet its requirements, whether those offenses currently exist in Georgia law or may be enacted in the future. Moss's claim therefore fails.

*Judgment affirmed. All the Justices concur.*

Decided March 25, 2021.
Murder. Houston Superior Court. Before Judge Adams.
*Ross & Pines, Noah H. Pines, Andrew S. Fleischman*, for appellant.

*George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.