NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 21, 2023

S23A0465. HATCHER v. THE STATE.

ELLINGTON, Justice.

A Liberty County jury found Perry Lee Hatcher, Jr., guilty of felony murder and cruelty to children in the third degree in connection with the shooting death of his wife, Dashea Hatcher, in the presence of their son, M. H.[1] Hatcher contends that his attorney was ineffective for failing to object to the qualifications of the State's

---

[1] The crimes occurred on November 5, 2014. On February 9, 2016, a Liberty County grand jury indicted Hatcher for malice murder, felony murder, aggravated assault, cruelty to children in the first degree, and cruelty to children in the third degree. During a trial that began on December 5, 2016, the jury found Hatcher guilty of felony murder, aggravated assault, and cruelty to children in the third degree. However, the jury found Hatcher not guilty of malice murder and cruelty to children in the first degree. On January 13, 2017, the trial court sentenced Hatcher to serve life in prison for the felony murder count, merged the aggravated assault count, and imposed a 12-month consecutive sentence for cruelty to children in the third degree. On January 27, 2017, Hatcher timely filed a motion for a new trial. The motion was heard on July 5, 2022, and denied on November 9, 2022. On November 18, 2022, Hatcher filed a timely notice of appeal. The appeal was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

expert witness and to rebut the expert's opinion concerning fibers found on the murder weapon. Because Hatcher failed to carry his burden of showing ineffective assistance of counsel, we affirm the trial court's order denying his motion for a new trial.

1. The evidence admitted at trial shows the following. At about 2:50 a.m. on November 5, 2014, Hatcher called 911 from his home in Hinesville, in Liberty County, and reported that his wife had shot herself. Officers responded to the home within minutes of the call. Hatcher, who was holding his baby, M. H., told the officers that Dashea had shot herself and that her body was upstairs.

One officer went upstairs to the master bedroom and saw Dashea lying in bed in a pool of blood. He saw a gun lying on her abdomen. This officer stood guard to make sure there was no unauthorized entry into the bedroom or any tampering with evidence. He testified that, as his sergeant, other officers, and paramedics arrived, he saw no one touch or move evidence at the crime scene before its location had been documented. The sergeant testified that he saw Dashea lying in bed with a gunshot wound to

2

her left cheek and a cell phone and a handgun on her abdomen. He video-recorded the scene shortly before the paramedics arrived.

When Detective Joshua Heath arrived, he photographed the bedroom and Dashea's body. He testified that he observed a Sig Sauer 9mm pistol lying on Dashea's stomach just below her breasts. He saw a pink cell phone below the gun and blood on Dashea's shirt and thighs. Although there was blood spatter on Dashea's body and clothing, the gun and cell phone appeared clean. He also noticed a child's pacifier resting between Dashea's thighs. He observed a wound on her left cheek with a powder burn around it. The crime-scene photographs show that Dashea's left arm rested against her left hip, her right arm rested against the pillow to the right of her head, and the handgun rested on her abdomen with the butt of the pistol pointing left. As Hatcher would later testify, Dashea was right-handed. Dashea's left contact lens had come out of her eye and had fallen to her right side. An unfired 9mm round rested between her upper thigh and the bed. Near Dashea's left side was a spent 9mm shell casing. Another unfired 9mm round was found at the foot

3

of the bed.

Detective Heath picked up the gun using gloves and, to make the weapon safe, he removed the magazine, which still contained rounds of ammunition. When he pulled back the slide to check the chamber, he saw that there was no round in the chamber. The detective, who had experience handling firearms in both the Army and the police force, testified that he found this "very surprising" because, when this type of a pistol is fired, the next round in the magazine ordinarily loads into the chamber once the spent shell casing has been ejected and the slide moves forward. Detective Heath also determined that no bullet was jammed in the barrel or the magazine.

When an officer swabbed Dashea's and Hatcher's hands for gunshot residue, Hatcher said: "I was up there, so there's gonna be residue on my hands." He also said that he purchased the firearm because there had been burglaries in the area. M. H.'s skin and clothing were not tested for gunpowder residue. However, photographs of M. H. taken at the scene showed blood spatter on the

4

back of his clothing.

When Detective Gail Poulsen arrived on scene, she asked Hatcher for his account of what happened. Hatcher said that he and his wife had argued in the master bedroom about a message she had seen on his Facebook page concerning a friend's lawn-mowing service. He showed the detective the messages on his tablet. He said that he went to sleep in the guest bedroom, but that Dashea followed him and hit him. They argued, and then she returned to the master bedroom. A few moments later, he heard a gunshot. He ran to the bedroom and saw his wife lying in the bed with a wound to her face and M. H. in her lap. After Hatcher made this statement, Detective Poulsen helped process and photograph the scene. The following day, one of Hatcher's neighbors told investigators that she thought it was strange that, just before the shooting, Dashea had changed her Facebook profile picture from one including her husband to one showing just her and her son.

The Hinesville Police Department contacted Danny Routh, who worked part-time as a crime-scene technician with the City of

Richmond Hill, for assistance in recovering fingerprint evidence from the gun. Routh testified that he processed the gun using an ultraviolet imaging system that he had used over 50 times before.

Routh testified that he had been a law enforcement officer for 31 years. When he was promoted to detective in 1998, he started processing crime-scene evidence in his cases because his department had no crime-scene technician. He trained in crime scene processing at the Georgia Public Safety Training Center and did an internship with Chatham County. He was thereafter certified as a crime-scene technician. He testified that he had processed over 750 crime scenes by the time of Hatcher's trial. He testified that he had also received training from the company that manufactured a reflective ultraviolet imaging system that he used to examine objects for fingerprints without damaging the fingerprints. After being cross-examined on his qualifications by defense counsel at trial, Routh was admitted without objection as an expert in his field as a crime-scene technician.

Routh testified that he found one fingerprint on the gun's slide

using the ultraviolet light imaging system. He also noticed what appeared to be "lint" on the gun that was not visible to the naked eye. He opined that the gun may have been "wiped down," given that he found only one fingerprint and a few fibers. He testified that the fibers "could have been any color" but appeared blue to him through his camera lens. He agreed that it was possible that the fibers could have come from a black scarf that Dashea was wearing when she died. Hatcher's forensic expert, Christopher Robinson, disputed that Routh's ultraviolet light images showed fibers on the gun. Robinson opined that the images showed blood spatter on the gun, given their shape, which he described as "punctate marks." He said that fibers would appear more elongated. However, the trial court would later find that Robinson had no training in identifying blood and instructed the jury to disregard his testimony, based solely on a visual inspection, about the presence of blood spatter on the gun.

After Routh conducted his analysis, the Hinesville Police Department sent the gun to the GBI Crime Lab for further analysis. A forensic technician processed the gun and found evidence that

Routh had missed: five partial latent prints (none of which were complete enough to be identified), and three faint stains on the slide, two of which were confirmed through DNA testing to be Dashea's blood. The technician testified that useable fingerprints could have been wiped away by the investigators who initially handled the weapon. No blood was found on the cell phone. A forensic examination of the gun revealed that it was working normally. The cartridge casing recovered from the scene matched cartridges test-fired from the gun. The gunshot residue test kits from Hatcher's and Dashea's hands both indicated the presence of gunshot residue. A forensic technician testified that the presence of particles could indicate that a person had fired a weapon, was in close proximity of the discharge, or had handled an item with gunshot residue on it.

Dr. Edmund Donoghue performed the autopsy of Dashea's body on November 5, 2014. He observed a gunshot wound on the left side of her face and a bullet inside the right side of her skull. The bullet traveled front to back, left to right, and upward. He observed a ring of abrasion and soot around the wound entrance. Dr.

Donoghue estimated the gun was fired about two to three inches from Dashea's left cheek, given the presence of gunpowder stippling measuring about two inches around the entry wound.

Dr. Donoghue testified that, in his experience, suicide wounds are primarily contact wounds, with the most common occurring either on the right temple, in the mouth, below the chin, or on the chest. He testified that, in his experience, more men than women use a firearm to commit suicide, with the ratio being about 70 percent to 30 percent, respectively. Captain James Snider, who was working at the Hinesville Police Department as a detective in 2014, also testified that, in his experience, women generally do not commit suicide with a firearm.

Captain Snider interviewed Hatcher on November 17 at the police department. He reviewed with Hatcher his *Miranda*[2] rights. Hatcher agreed to waive them and signed a waiver-of-rights form. During the interview, Hatcher maintained that he did not shoot his wife. He said he heard a gunshot, went to the bedroom, and saw M.

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 S. Ct. 1602, 16 LE2d 694) (1966).

9

H. lying on Dashea's lap. He said that he did not pick up the gun; rather, he slid it aside when he grabbed his son. He said that his wife had been upset at him for not answering the phone when he was playing basketball at the gym. He said that he had asked her for a divorce. He also said that, after Dashea's death, he agreed to relinquish his parental rights to M. H. to his in-laws if they paid him $150,000.

The State presented evidence showing that, although Dashea had bouts of depression in the past and post-partum depression following M. H.'s birth, she had received treatment for her depression and was not suicidal. She even jokingly told one friend that, no matter how depressed she got, she would never kill herself because that would mean leaving M. H. with Hatcher. The State also presented friends and family members of the couple who testified that the Hatchers' marriage was troubled, that Hatcher drank excessively, and that he had numerous affairs. Dashea's mother testified that Hatcher contacted her when Dashea was pregnant and confessed that he did not think that he and Dashea would be able to

make their marriage work. He admitted to her that he was a "liar" and a "cheat" and that he had been "having a texting conversation with another female." Dashea's mother observed that, after M. H. was born, Hatcher appeared distant and would sit in the garage by himself, sometimes with a beer or cigar. Dashea told her mother that Hatcher did not interact with his family.

The State presented evidence that, on the night of November 4 and early into the morning of November 5, 2014, Dashea was exchanging text messages with a friend in California. The texts show that, near midnight, Dashea informed her friend that she was packing up M. H.'s clothing and preparing to move to South Carolina, where she had family. Dashea said she wanted a divorce because she had caught her husband texting another woman and was "basically fed up and taking the baby to her mom." She also knew that Hatcher had asked his mother about how to get a divorce. Dashea said she intended to get alimony and child support. The friend offered her reassurance, telling her to focus on M. H. Dashea sent her last message at 2:08 a.m. – about 40 minutes before

11

Hatcher called 911. The friend did not call Dashea that night because she saw no reason to; Dashea had complained about Hatcher's behavior before, and her texts were not "abnormal." The friend testified that the couple argued often and that, on an occasion when she was staying with them, she had witnessed Dashea and Hatcher having a heated argument that resulted in Hatcher packing a bag and leaving the house as Dashea followed, demanding that he explain where he had been and where he was going.

Another one of Dashea's friends testified that Hatcher's behavior after Dashea's death was unusual and that it appeared like he was celebrating. The witness testified that Hatcher turned on music and danced during a gathering of family and close friends who were grieving Dashea's death. After Dashea's funeral, her parents sought a temporary custody order for M. H. Thereafter, according to Dashea's mother, Hatcher offered to relinquish his parental rights to them if they would pay him $150,000. Hatcher suggested they get the money from the beneficiary of Dashea's life insurance policy. Dashea's mother testified that she later learned that Dashea had

named her aunt as a beneficiary. Because Hatcher, like Dashea, was in the Army, he knew that Dashea was covered by an insurance policy. Dashea's parents agreed to Hatcher's offer, though they never received any insurance proceeds. Dashea's mother recorded a conversation with Hatcher about the agreement, which was played for the jury. Their agreement, which was reduced to writing and signed, was also introduced in evidence.

The State also presented testimony from two women with whom Hatcher had had affairs while he was married to Dashea. One of these women testified that, when she was visiting Hatcher in his home in October 2014, he told her that the baby items present in his home belonged to "his sister." Just days before Dashea's death, he told this woman that he wanted to "wife" her and "put a ring on her." The last time this witness saw Hatcher, in early November, he told her that his "ex-girlfriend passed away."

Another woman who had been Hatcher's girlfriend in 2012 and 2013, testified that she had reconnected with Hatcher in 2014, after he returned from Afghanistan, and they resumed a sexual

relationship. At the time, she was unaware that Hatcher was engaged to Dashea. When she learned of the engagement, Hatcher told her there was "a baby involved." Later, Hatcher admitted to her that he was married but said that he was getting a divorce. The State presented evidence that Hatcher texted extensively with this woman during October and November and that the two professed love for each other. On November 4, 2014, at 10:16 p.m., Hatcher told this woman that he was going to be "in the field" for the next month. When she invited him to stay with her during the holidays, he responded that he was at a friend's house but that he had no plans for the holidays. She also asked to see his divorce papers, but Hatcher did not reply until November 8, when he texted her that his "ex-wife" had died.

Hatcher testified in his defense at trial. He said that, on the night of November 4, he had been downstairs playing Xbox games while Dashea was taking care of M. H. upstairs. He said he went upstairs around 11:00 p.m. to go to bed and was later awakened by Dashea standing over him, accusing him of cheating. He claimed

that she threw his phone at him and called him a cheater and then punched him in the face and chest. He said he got out of bed to lie down in the spare bedroom, but, after he dozed off, she came in and yelled at him again and hit him. When M. H. started crying, Dashea returned to the master bedroom and yelled at her son. Then it got quiet, and he heard a gun go off. Hatcher testified that he ran to the bedroom, where he saw Dashea with a gunshot wound to her head and the baby "across her lap." He said he used two fingers to push the gun away, which he said was lying on his son's arm. He grabbed M. H. and then called 911.

Hatcher also claimed that exchanging his parental rights for $150,000 was Dashea's mother's idea. He denied knowing the identity of the beneficiary of Dashea's life insurance policy. He admitted, however, that he had lied to his girlfriends multiple times about his marital status. On cross-examination, he claimed that he did not think it was relevant to tell the police about his affairs. Finally, he confirmed that Dashea was right-handed.

2. Hatcher contends that his trial counsel rendered

constitutionally ineffective assistance by failing to object to Routh's fiber-evidence opinion testimony on the ground that Routh was not qualified as an expert on fiber evidence. He also argues that counsel was deficient in failing to present expert testimony rebutting Routh's opinion. While Routh's testimony with respect to blood and fingerprint evidence on the gun was contradicted by GBI experts, no witness contradicted Routh's testimony that fibers were present on the gun. Thus, Hatcher argues, even if Routh was qualified to testify as he did, trial counsel was constitutionally deficient in failing to rebut this testimony. Further, during the hearing on his motion for a new trial, Hatcher presented evidence that the State had disclosed during discovery an unsigned GBI report showing that the gun had been "examined for the purpose of collecting and preserving potential hair and/or fiber, and none were found." Trial counsel did not speak with the author of the report prior to trial and did not present that person as a witness. Hatcher argues that counsel's failure to effectively rebut Routh's testimony with this report prejudiced Hatcher because Routh's testimony provided a basis for

the jury to infer that he had "wiped down" the gun to remove his fingerprints. For the following reasons, the trial court did not err in denying Hatcher's motion for a new trial on ineffective assistance of counsel grounds.

To prevail on his claim of ineffective assistance of trial counsel, Hatcher must prove both that his counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Hatcher must show that his counsel performed "in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). To prove prejudice, Hatcher "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694

17

(III) (B). "This burden is a heavy one[.]" (Citation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if Hatcher fails to prove either the deficiency or the prejudice prong, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

Pretermitting whether trial counsel was constitutionally deficient in his failure to object to Routh's qualifications to give fiber-evidence testimony or his failure to rebut that testimony with the GBI fiber-evidence report, Hatcher has failed to show a reasonable probability that, in the absence of counsel's allegedly deficient performance, the outcome of his trial would have been different. See *Strickland*, 466 U.S. at 694 (III) (B). First, counsel effectively challenged Routh's testimony in other ways, and second, the State's case against Hatcher was strong even without Routh's testimony.

On cross-examination, Routh admitted that what he believed were fibers on the gun could have come from other sources, including the scarf Dashea was found wearing around her neck. GBI forensic witnesses testified that they – unlike Routh – had found blood and

18

a number of partial latent finger prints on the gun, but none of those witnesses testified concerning the presence of fibers. A witness also testified that is was possible that fingerprint evidence may have been compromised by the investigators who initially handled the weapon. Thus, Routh's testimony that he saw fibers on the gun was not conclusive evidence that the gun had been "wiped down." Finally, although Hatcher's expert, Robinson, was disqualified from giving testimony about alleged blood spatter on the gun, he was not disqualified from testifying that he did not believe Routh's ultraviolet system images showed the presence of fibers on the gun. Based on this evidence, defense counsel argued that Routh was speculating as to presence of and source of any fibers, that he "didn't know what he was doing[,] and the State didn't have the proper controls in place to stop that evidence [derived from the gun] from being tainted." Thus, the record shows that Routh's testimony concerning the presence of fibers on the gun and his opinion that the gun had been "wiped down" was, indeed, challenged.

But, even if the jury credited Routh's opinion testimony that

19

Hatcher had wiped evidence from the gun, that testimony was not critical to proving that Hatcher shot Dashea. The record shows that several witnesses testified that Dashea did not appear suicidal to them. They testified that Dashea sought treatment for her post-partum depression, she loved her son, she was happy to be a mother, and she was actively packing to move to South Carolina to be with family who were supportive of her. She told a friend that she would not kill herself because that would mean leaving her son with Hatcher. The record also shows that Dashea planned to divorce Hatcher. She was "fed up" with his drinking, his dishonesty, and his infidelities. Hatcher, on the other hand, was an admitted cheater and liar who had a motive to kill his wife. He wanted out of his marriage, but he did not want to pay child support or alimony. In fact, he tried to sell his parental rights to his child's grandmother.

The jury also heard expert forensic testimony from which they could infer that it was unlikely that Dashea had shot herself while sitting in bed, holding her baby, as Hatcher had testified. As the prosecutor argued in closing, in order for Dashea, who was right-

handed, to inflict the fatal injury that she suffered, she would have had to reach across her body with her right hand and over or around her baby with a loaded firearm and then twist either her head or her hand to aim the gun at her left cheek. Although it is possible that Dashea shot herself with her non-dominant hand, the evidence shows that Dashea's left hand rested on top of her left hip and not next to her head. And the gun, which had very little blood on it, was found lying in the middle Dashea's abdomen instead of near her head or on the left side of her body.

The State argued, based on the following evidence, that it was more likely that Hatcher had shot Dashea during an altercation in the bedroom and then staged the scene to make it appear that Dashea had committed suicide. Hatcher testified that, during a heated argument about his cheating, Dashea struck him repeatedly and yelled at him. The prosecutor argued that the forensic evidence was consistent with the shooting having occurred during a struggle, not while Dashea was sitting in bed with her son on her lap. For example, a shell casing was on the floor to the left side of the bed;

one unfired round was beneath Dashea's body and another at the foot of the bed; no blood spatter was on Dashea's cell phone; and someone had likely cleared the gun of the round in the chamber after it had been fired. Hatcher also had gunpowder residue on his hands, which was inconsistent with his testimony that he was not in close proximity to the gun when it was fired and that, after he ran into the Dashea's bedroom, he just slid the gun away from M. H. with two fingers. Although there was no blood spatter on Hatcher, the record supports an inference that he had time to stage the scene and change clothes before he called the police.

In light of the challenges counsel did make against Routh's testimony as well as the strength of the State's case against Hatcher even apart from Routh's testimony, Hatcher has failed to carry his burden of showing a reasonable probability that the jury would not have found him guilty of the crimes charged. The jury had ample evidence from which to conclude that Hatcher and Dashea argued and that Dashea's death occurred as a result of an aggravated assault by an admittedly unfaithful husband who wanted out of his

marriage without having to pay alimony and child support. Consequently, because Hatcher has failed to show a reasonable probability that the outcome of his trial would have been different in the absence of his counsel's allegedly deficient performance, his claim of ineffective assistance fails. See, e.g., *Moss v. State*, 311 Ga. 123, 126, 128 (2) (a) (856 SE2d 280) (2021) (Pretermitting whether trial counsel was constitutionally deficient in his failure to introduce gunshot residue and fingerprint reports, considering the totality of the evidence, the defendant failed to show a reasonable probability that, in the absence of the alleged deficient performance, the outcome of the trial would have been different.); *Revere v. State*, 302 Ga. 44, 48-49 (2) (a) (805 SE2d 69) (2017) (Counsel's deficient performance in failing to object to certain character evidence was not prejudicial because, considering the totality of the evidence, there was no reasonable probability that, in the absence of that deficient performance, the outcome of the trial would have been different.).

*Judgment affirmed. All the Justices concur.*