321 Ga. 240
FINAL COPY

S25A0190. NESBIT v. THE STATE.

LaGrua, Justice.

Appellant David Nesbit, Jr., appeals his convictions for malice murder and other crimes related to the shooting death of Gregory Gabriel and the aggravated assault of Cachino Minor.[1] On appeal, Nesbit contends that his trial counsel was constitutionally ineffective in the following respects: (1) by failing to recognize,

---

[1] Gabriel was fatally shot on June 17, 2020. On January 7, 2021, a Cobb County grand jury indicted Nesbit for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Counts 2 and 3); felony murder predicated on possession of a firearm by a convicted felon (Count 4); aggravated assault of Gabriel (Count 5); aggravated assault of Minor (Count 6); and possession of a firearm by a convicted felon (Count 7). Nesbit was tried from July 11 to July 15, 2022, and the jury found Nesbit guilty on all counts. The trial court sentenced Nesbit to life without the possibility of parole on Count 1 (malice murder); Counts 2, 3, and 4 (felony murder) were vacated by operation of law; Count 5 (aggravated assault of Gabriel) merged with Count 1; the trial court sentenced Nesbit to 20 years to serve in confinement on Count 6 (aggravated assault of Minor) to run consecutively to Count 1; and the trial court sentenced Nesbit to 15 years to serve in confinement on Count 7 (possession of a firearm by a convicted felon) to run consecutively to Count 6. Nesbit filed a timely motion for new trial, which he later amended through new counsel on June 29, 2023. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on May 29, 2024. Nesbit filed a timely notice of appeal to this Court, and the case was docketed to the term beginning in December 2024 and submitted for a decision on the briefs.

research, and assert defense of habitation at trial; and (2) by failing to object to the State's closing argument, during which the prosecuting attorney purportedly opined about the credibility of Minor — the State's primary witness — as well as expressing the prosecutor's personal opinion about Nesbit's guilt and the strength of the State's case against him. For the reasons that follow, we affirm Nesbit's convictions in this case.

The evidence presented at trial showed that, on the night of June 17, 2020, Nesbit and his girlfriend, Jamonda Kirkland, had planned "a date night" to "go out and eat and enjoy [them]selves." According to Kirkland, when she and Nesbit left her apartment that night, they were traveling in Nesbit's car — a white sedan "with a black front bumper" — and Nesbit drove to a Texaco gas station in Mableton where he planned to "[r]eturn[ ] a lottery ticket in exchange for gas." Nesbit and Kirkland arrived at the gas station around 9:40 p.m., and Nesbit parked beside a gas pump and went inside the gas station's convenience store. Kirkland stayed in the

front passenger seat of the car.[2] The owner of the convenience store testified that, when Nesbit entered the store, he went to the counter and "cashed" a lottery ticket, after which he prepaid "$15 at pump number two" and was "given $20." Nesbit went back outside to his car and began pumping gas at pump number two.

A minute or two later, Gabriel and his friend, Minor, arrived at the gas station in Gabriel's car, a gray Honda Civic. Minor testified that he and Gabriel — who was like "a brother" to him — worked for Crystal Springs Water at that time, and they were on a 30-minute break from their eight-hour work shift, which lasted from 4:00 p.m. until 12:00 a.m. The two men decided to take their break "off premises," and they drove to the Texaco gas station to "get something to drink." Minor testified that, when they arrived at the

---

[2] The gas station had several surveillance video cameras mounted inside and outside the store, which were operational on the night in question. The details of what occurred on June 17 are recorded in the surveillance videos. Detective Ronson Smith with the Cobb County Police Department's technology-based crimes unit was qualified as an expert at trial in forensic video acquisition and analysis and testified regarding his review and analysis of the surveillance videos from the gas station, as well as what was reflected in those videos. The surveillance videos were admitted and played for the jury at trial.

gas station, Gabriel parked his car "right along [the] curb" beside "pump number one," and Minor noticed a white "four-door sedan" parked "on the other side of the exact same pump," "facing opposite" of Gabriel's car. According to Minor, after Gabriel parked the car, he "got out and went in the store," and Minor "stayed in the car" in the "front passenger seat."

While Gabriel was walking into the store, Minor observed that the man standing next to the white car pumping gas — later identified as Nesbit — was watching Gabriel, and Minor "thought it was very odd." Minor testified that he had never seen Nesbit before that night; he and Gabriel "just work[ed]" in that area and did not "know anybody around there." After Gabriel got out of the car, Minor realized that Gabriel's "firearm" had fallen "right in the middle" of the driver's seat, so Minor "grabbed it and moved it out of the seat and put it on the dash so [Gabriel] could get back in the car without having to grab that in his hand."[3] Minor testified that Gabriel had

_____

[3] Detective Smith confirmed that, according to the surveillance videos from the gas station, the passenger in the gray Honda Civic — i.e., Minor — "move[d] with his hand toward the dash" with what appeared to be a "gun in

4

carried a firearm "for years," but "never had any conflict or anything." Minor said the firearm was registered in Gabriel's name; Gabriel kept it strictly "as protection"; and it was "normal for him to have [the firearm] in the car."

According to the owner of the convenience store, Gabriel entered the store about a minute after Nesbit and purchased "lemonade and orange juice"; he then exited the store and returned to his vehicle. Minor testified that, as Gabriel was getting into the driver's seat of his vehicle with the "bag [of] juice," Minor "slid [Gabriel's firearm] back beside him" on the seat and told him, "[L]et's go man, this guy keeps looking." Gabriel then "looked over" at Nesbit, and Minor heard Nesbit say, "[Y]ou got a problem?" Gabriel responded, "[N]o, I don't have a problem, do you?" Minor heard Nesbit respond, "[Y]eah, what's up." Minor testified that, as Gabriel was "put[ting] his bag down," Minor heard the "female in the passenger side of the white car" say, "[N]o, no baby, no," followed

his hand" and set the gun "on the dash." According to Detective Smith, Nesbit was "facing away" while Minor was placing the gun on the dashboard.

by "a gunshot." Minor did not know "if that first gunshot hit" Gabriel or not, but Gabriel "flinched." Gabriel then "grabbed his gun" and fired back. Minor could not say exactly how many shots were fired, other than "multiple," and he was "afraid of getting hit." Minor observed that the white car was moving during the shooting, and it appeared that Nesbit was "almost shooting and driving at the same time." According to Minor, Gabriel "didn't even have keys in the ignition"; they were "just parked . . . like sitting ducks."

Kirkland testified to a different version of these events, stating that, when the man driving the gray car — whom she later learned was Gabriel — returned to his car from the convenience store, Nesbit had finished pumping gas and was in the process of getting back into the driver's seat of his car. Kirkland testified that she heard Gabriel ask Nesbit, "[D]o you have a problem?" Kirkland said Nesbit did not respond, and Gabriel shouted, "[D]o you have a problem?" Kirkland said Nesbit still did not respond, and at that point, she saw "[Gabriel] reach[ ] for something that appeared black." According to Kirkland, Gabriel "rolled down his window" and "began to shoot out

the window" at Nesbit's car. Kirkland testified that Nesbit was in the car, and he "began to drive" away and "shoot back" at Gabriel's car. Kirkland emphasized that Nesbit did not start shooting until "after he began to drive" and after "several rounds" had already been fired from Gabriel's car.

Detective Smith, the State's expert in forensic video acquisition and analysis, testified that — as established by the surveillance videos from the gas station — after Gabriel exited the convenience store, "some type of verbal interaction" took place between him and Nesbit while Gabriel was "in the process" of opening his car door and sitting down." Detective Smith further testified that, shortly after this "exchange of words," "there [was] gun play," which began after Gabriel was already in the driver's seat with the door closed and the "white vehicle" was "moving and pulling away" from the gas pumps. Based upon his review and analysis of the surveillance videos, Detective Smith concluded that Nesbit "clear[ly] present[ed] a handgun first" and "shot first," which was further evidenced by the "distinct muzzle flashes" coming from the driver's side of Nesbit's

7

vehicle and the fact that Gabriel had not "even obtained his gun" when the shooting started.

Minor testified that, following the shooting, Gabriel started "driving back toward the direction of the job," but Minor "could tell something was wrong because [Gabriel] was kind of breathing heavy." Minor described Gabriel's state as, "almost like when you get the wind knocked out of you and you can't really breathe." According to Minor, "that's when [he] knew. So [he] lifted [Gabriel's] shirt up to try to . . . see what was going on. And [he] could see blood." At that point, Minor "had to take control of the wheel," try to "push the brake with [his] hand," and "put [the car] in park," but he "couldn't reach far enough." Eventually, Minor "slowed [the car] down enough to get it to slow to a standstill" and tried to call 911,[4] but he "couldn't really think" or "tell [the police] where [he] was." Minor testified that he "jumped out [of the car] and asked the car that was behind [them] to call the police because [he] couldn't mentally put it together all the way."

---

[4] The 911 call was admitted and played for the jury at trial.

Antoinette Walker and Lisa Henderson were traveling behind Gabriel's car on their way home from church when they noted that the car in front of them "seemed to be out of control." Walker put her "blinkers on and followed behind the car very slowly to keep the other cars away from hitting anything or anything big happening." Gabriel's car eventually drove into the grass on the side of the road, and Walker pulled her car over on the side of the road, as well. Henderson testified that, as soon as the cars came to a stop, the passenger of the car in front of them "jump[ed] out on the passenger side and said call 911, call 911 . . . I think he's dead." The women testified that Minor "was screaming," "panicking," and "emotionally distraught." Henderson called 911,[5] and the women waited with Minor until police officers and the ambulance arrived. The police officers who arrived on the scene observed that Minor was "frantic," and that Gabriel was slumped over inside the vehicle with blood stains on his shirt and on his seat. The police officers also noted that there were bullet holes in the driver's side door, "the rear of the

_____

[5] The 911 call was admitted and played for the jury at trial.

vehicle's driver's side," and the trunk of the car. The "back driver's side window was [also] shattered." The police officers "immediately began life-saving measures" on Gabriel and located a gunshot wound "around his left nipple." Gabriel was pronounced dead at the scene.[6] Gabriel's 9mm handgun, which was registered in his name, was located by law enforcement in the center console of his vehicle.

Kirkland testified that, when she and Nesbit left the gas station, they got on "[I-]20" and drove for "maybe 20 minutes," at which point Nesbit pulled off the highway in an area with which Kirkland "[was] not familiar." According to Kirkland, Nesbit left his car "[j]ust off the highway," and they got into another car with someone she did not know to "go home." Kirkland could not recall if Nesbit took the car keys or any gun with him, testifying that she "never saw [Nesbit's] gun at all." Kirkland insisted that, while she "heard the gunshots" at the gas station, she (1) did not see Nesbit "retrieve the gun initially before firing rounds"; (2) did not see "him

_____

[6] The medical examiner testified at trial that Gabriel died from "a penetrating gunshot wound to the chest."

shooting back" at Gabriel; (3) did not "see the gun in [Nesbit's] car at all"; and/or (4) did not "see [Nesbit] with the gun after [they] got out of the car" and left it just "off the highway." According to Kirkland, in addition to abandoning his car after the shooting, Nesbit also got a "new phone number."

Cobb County Police Lieutenant Zachary Stannard was one of the lead detectives assigned to the investigation of this case. Lieutenant Stannard testified that, on June 18, the day after the shooting, a BOLO ("be on the lookout") was issued by the Cobb County Police Department for a person of interest and a "suspect vehicle" — specifically, "an older model white Toyota Avalon" with a "black front bumper." According to Lieutenant Stannard, the police department generated the BOLO based on information obtained from the surveillance videos from the gas station, as well as images taken from "motion[-]activated" "Flock license[-]plate readers" positioned by law enforcement on "roadways and intersections" throughout the metro-Atlanta area.[7] After reviewing the images

_____

[7] Lieutenant Stannard testified that Flock license-plate readers operate

taken by the Flock license-plate readers in Cobb County and surrounding counties, Lieutenant Stannard was able to locate images of a white Toyota Avalon with a black front bumper, Georgia tag number RLY5906, "[a]pproximately three miles" away from the subject gas station at 9:47 p.m. on June 17. The same Toyota Avalon was captured by a Flock license-plate reader later the same night at 10:05 p.m. in DeKalb County near McAfee Road and I-20, about 17 miles away from the gas station where the shooting occurred. The vehicle was then captured one final time less than a minute later heading in the opposite direction on McAfee Road. No additional images of the white Avalon were taken after that timeframe.

Atlanta Police Detective Ron Sluss was qualified as an expert at trial in "cellular mapping and cellphone analysis," and he testified regarding his review and analysis of Nesbit's cell phone records, which were obtained by search warrant during the investigation. According to Detective Sluss, at 9:25 p.m. on June 20, 2017, Nesbit's

_____

by taking "an image of the rear of the vehicle as well as the tag of the vehicle" as it passes, and the cameras can "detect the letters and numbers on the tag[,] as well as what [make and] type of vehicle it is."

12

cell phone was located "northwest of where the ultimate crime scene would be." At 9:46 p.m., Nesbit's cell phone hit a tower "encompass[ing] the area of the crime scene," and a phone call was placed to someone located in Decatur, DeKalb County. At 10:03 p.m., Nesbit's cell phone received an incoming call while "in the area of McAfee Road . . . in Decatur, Georgia."

Lieutenant Stannard testified that he ran the license plate number for the Toyota Avalon through the National Crime Information Center and noted that it "was currently registered at the time as a 1999 Toyota Avalon to a David Anthony Nesbit."[8] Additionally, Lieutenant Stannard found "a driver's license number associated with that vehicle registration," which "also came back to a David Anthony Nesbit with the same date of birth and the same physical address, mailing address" as the car registration. Lieutenant Stannard testified that the picture on the driver's license matched the photograph of the person in the Cobb County Police

---

[8] Nesbit's father testified that his son drove a "white Avalon" for "at least maybe three or four years."

Department's BOLO from the surveillance videos at the gas station. On this basis, Lieutenant Stannard obtained an arrest warrant for Nesbit, which he provided to the other lead detective in the case, Cobb County Police Detective Sara Penirelli.

Detective Penirelli testified that she provided the arrest warrant for Nesbit to the United States Marshals Service, who arrested Nesbit on June 30, 2017 at Kirkland's apartment. U. S. Marshals transported Nesbit to the Cobb County Police Department, where he was advised of his *Miranda*[9] rights and interviewed by Detective Penirelli and Lieutenant Stannard. During this interview, Nesbit denied any awareness of or involvement in the shooting on June 20.

Shortly after Nesbit's arrest, Detective Penirelli obtained a search warrant for Kirkland's apartment. During that search, police officers found a wallet with Nesbit's driver's license and credit cards, a 9mm handgun, and an "LG phone" which had been activated on

---

[9] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

June 20, 2017. On June 30, Detective Penirelli obtained a search warrant for Nesbit's father's residence — the residential address that appeared on Nesbit's driver's license and motor vehicle registration. During the search of that residence, Detective Penirelli found insurance documents and an insurance cancellation notice for a 1999 Toyota Avalon, Georgia tag number RLY5906, with the insured's name of David Nesbit, Jr., as well as the registration information for the tag. Detective Penirelli showed Nesbit's father images from the gas station surveillance videos depicting the person police officers believed to be Nesbit, and his father said, "He believed it was his son." Detective Penirelli testified that she tried to interview Kirkland after the shooting and "attempted to call her multiple times," including going by her residence, but "did not receive any contact back."

The GBI firearms examiner, who testified as an expert in firearms identification and analysis at trial, testified that she examined 11 cartridge casings recovered during the investigation of this case from Gabriel's vehicle and the crime scene, and she

15

determined that the casings were fired from two different 9mm handguns. The firearms examiner confirmed that five of those casings were fired from Gabriel's handgun. However, the other six casings — while fired from the same handgun — were not fired from Gabriel's handgun or the 9mm handgun found in Kirkland's apartment. The handgun from which the six 9mm shell casings were fired was never located.

Nesbit contends that his trial counsel was constitutionally ineffective in two ways: first, by failing to recognize, research, and assert defense of habitation at trial; and second, by failing to object to the State's closing argument, during which the prosecuting attorney purportedly gave her personal opinion about the credibility of one of the State's witnesses and Nesbit's guilt in this case. We will address each contention in turn, applying the constitutional standard set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

deficient, and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citing *Strickland*, 466 U.S. at 687-695 (III)). "To prove deficient performance," a defendant "must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 272-273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Taylor v. State*, 312 Ga. 1, 15-16 (6) (860 SE2d 470) (2021) (citations and punctuation omitted). See also *Robinson v. State*, 278 Ga. 31, 37 (3) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel," and "[a] reviewing court evaluates trial counsel's performance from counsel's perspective at

the time of trial.") (citation and punctuation omitted). Our assessment is an objective one, not based on the subjective views of trial counsel. See *Lane v. State*, 312 Ga. 619, 623 (2) (a) (864 SE2d 34) (2021) (noting that "we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct") (citation and punctuation omitted).

"To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126 (2). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (citation and punctuation omitted). And, "[i]n reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." *Winters v. State*, 305 Ga. 226, 230 (4) (824 SE2d 306) (2019). See also *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003) ("We accept the trial court's factual findings and credibility

18

determinations unless clearly erroneous, but we independently apply the legal principles to the facts.").

Nesbit first contends that his trial counsel provided ineffective assistance by failing "to recognize the applicability of the defense of habitation to the facts of this case" and by failing "to research this defense," which is "more favorable to a criminal defendant than general self-defense." Nesbit further contends that "the defense of habitation, when supported by at least slight evidence, is harder for the State to disprove beyond a reasonable doubt" because, "unlike the defense of justification, the habitation defense, in recognition of the sanctity of a person in his [motor vehicle or home], allows the use of deadly force in certain situations even if the occupant does not fear death or great bodily injury."

We see no merit to Nesbit's contention that his trial counsel was ineffective in this respect. OCGA § 16-3-23 provides that "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's

19

unlawful entry into or attack upon a habitation," which includes a motor vehicle.[10] Id. See also OCGA § 16-3-24.1. However, we have held that "deadly force may be used [in the defense of habitation context] *only when* an 'entry is made or attempted in a violent and tumultuous manner' or 'for the purpose of committing a felony,'" but the "use of deadly force" may *not* be used "when no entry is made or attempted." *Brooks v. State*, 309 Ga. 630, 636 (2) (847 SE2d 555) (2020) (quoting OCGA § 16-3-23 (1), (3); emphasis supplied). Accordingly, for the defense of habitation to apply, "there would need to be evidence that [the victim] was entering or attempting to enter [the appellant's habitation] at the time that [the a]ppellant shot him." *Walker v. State*, 301 Ga. 482, 486 (2) (b) (801 SE2d 804) (2017) (determining that "there was simply no evidence of an entry or attempted entry by [the victim] into the [appellant's] SUV when [the a]ppellant opened fire"). See also *Brooks*, 309 Ga. at 636 (2) (concluding that there was no evidence that the victims "entered"

_____

[10] OCGA § 16-3-24.1 defines "habitation" as "any dwelling, motor vehicle, or place of business."

the appellant's vehicle during the incident in question, and thus, the defense of habitation was not available).

In this case, no evidence was presented at trial of any entry or attempted entry by Gabriel or Minor into Nesbit's vehicle. See *Walker*, 301 Ga. at 486 (2) (b). Additionally, while testifying at the hearing on Nesbit's motion for new trial, Nesbit's trial counsel acknowledged that, generally, the "defense of habitation involves defending from attempted entry or entry into a habitation," and based on the facts of this case, she did not consider "the defense of habitation" as being "applicable." Nesbit's trial counsel further testified that her focus was "consumed in [Nesbit's] justified act of protecting himself" and "his girlfriend," and she requested jury instructions on self-defense and justification, which were given by the trial judge. Trial counsel emphasized that, at trial, her "argument was based on self-defense and not the vehicle," and she felt that she was "able to get those instructions to get that argument before the jury."

Nesbit bears the burden of showing that his trial counsel's

actions were "patently unreasonable," and he has not done so. *Lockhart v. State*, 298 Ga. 384, 386 (2) (782 SE2d 245) (2016). Based on the evidence presented at trial, Nesbit's trial counsel recognized that defense of habitation was not applicable here, see *Walker*, 301 Ga. at 486 (2) (b), and therefore his trial counsel was not deficient for not raising it.

Nesbit next contends that his trial counsel was ineffective for failing to object to the State's closing argument, during which the State purportedly opined about the credibility of Minor's testimony, Nesbit's guilt, and the prosecutor allegedly provided a personal opinion about the strength of the State's case against Nesbit.

During Nesbit's closing argument, he contended that Kirkland's trial testimony established that Gabriel fired the first shot in this case. Nesbit's trial counsel told the jury that

> Kirkland took that stand blind, having never seen the [surveillance] video[s]. [Minor] told y'all that he prepared his testimony with [the prosecution]. You know, it also makes a difference with how you're treated. . . . [W]hen you think about [Minor], remember he was prepared.

Nesbit's trial counsel further stated:

22

> [G]ood, bad or ugly, [Kirkland] told her truth. Good, bad or ugly. You know, she spoke to the DA one day. They never prepped her. They never showed her the video. Because they don't want you to believe her story. But her story is just as important. What she went through is just as important. But that's when they just try to make you not like him. And that's not enough.

Nesbit's trial counsel then told the jury that the State had the authority to interview Kirkland, but failed to do so "[b]ecause they were going for one side of the story."

During the State's final closing argument — apparently in response to Nesbit's assertion that the State had "coached [Minor] and told him what to say, showed him the video" — the prosecutor argued:

> It is absolutely crazy to think that the State — that myself, Ms. Stevenson — would not meet with our witnesses before trial and understand what happened. We weren't there. It is so important that we understand what happened before we come in this courtroom. That's why we meet with our witnesses. We have to know and understand the facts before we can go to trial. Right? We can't just read things. We want the whole picture. I want to look at the individuals myself. I want to hear what they have to say. I want to make sure it makes sense. Right? I want to make sure there is not an issue. Because if there is an issue, we're not going to be here. If I meet with someone and I'm like this isn't adding up, you are never

23

going to meet them. Because I'm not going to come in here and present some case that I don't believe happened in the way that the witnesses are testifying.

At Nesbit's motion-for-new-trial hearing, his trial counsel testified that, while she felt "uncomfortable" when the State made this argument, she did not object because she did not want to "cause[ ] more attention negatively for Mr. Nesbit if [she] was overruled for objecting during argument." Nesbit's trial counsel testified that she also knew the trial court would instruct the jury — and ultimately did instruct the jury — that closing arguments are not evidence. Trial counsel further recognized that some of the prosecutor's remarks were in direct response to the statements she made during Nesbit's closing argument.

In the trial court's order denying Nesbit's motion for new trial, the trial court credited the testimony of Nesbit's trial counsel that "she chose not to object during the State's closing argument because she did not want to call more attention to the prosecutor's statements," and the trial court found that this decision did "not constitute deficient performance." We agree.

24

"A closing argument is to be judged in the context in which it is made." See *Styles v. State*, 309 Ga. 463, 470-471 (4) (847 SE2d 325) (2020) (citation and punctuation omitted). "A prosecutor is granted wide latitude in the conduct of closing argument," and "[w]ithin that wide latitude, a prosecutor may comment upon and draw deductions from the evidence presented to the jury." *Gaston v. State*, 307 Ga. 634, 640 (2) (b) (837 SE2d 808) (2020) (citation and punctuation omitted). "Whether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Smith v. State*, 296 Ga. 731, 735-736 (2) (b) (770 SE2d 610) (2015) (citations and punctuation omitted).

Accordingly, here, to establish that his trial counsel performed deficiently, Nesbit must show that, "under the circumstances, the challenged action cannot be considered a sound trial strategy." *Zayas v. State*, 319 Ga. 402, 411 (3) (902 SE2d 583) (2024) (citation and punctuation omitted). And we have held that electing not to object

to a closing argument that is not unduly prejudicial or clearly improper to avoid drawing negative attention to the defendant or highlighting unfavorable evidence is a reasonable trial strategy. See *Young v. State*, 305 Ga. 92, 97-98 (5) (823 SE2d 774) (2019) (concluding that trial counsel's strategy of weighing the "upside of arguably objectionable [comments]" against "its downside" and ultimately deciding not to object to avoid drawing negative attention to the defendant was reasonable). Moreover, in this case, the prosecutor was merely responding to comments Nesbit's trial counsel made during Nesbit's closing argument about the State's allegedly disparate treatment of Kirkland and Minor and was not opining about Kirkland's credibility or giving a personal opinion about the strength of the State's case against Nesbit. See *Pyne v. State*, 319 Ga. 776, 786 (2) (906 SE2d 755) (2024) (explaining that a prosecutor's closing argument may, among other things, respond to points made in the defendant's closing argument).

Based on the foregoing, we conclude that Nesbit failed to meet his burden of showing that his trial counsel was constitutionally

26

deficient for failing to object to the State's comments during closing argument because, as the record reflects, his trial counsel's decision under the circumstances was a reasonable one. See *Young*, 305 Ga. at 97-98 (5). See also *Clark v. State*, 300 Ga. 899, 903 (2) (b) (799 SE2d 200) (2017). Therefore, this ineffective assistance of counsel claim also fails.

*Judgment affirmed. All the Justices concur.*

Decided March 4, 2025.

Murder. Cobb Superior Court. Before Judge Hill.

*Benjamin D. Goldberg*, for appellant.

*Flynn D. Broady, Jr., District Attorney, Elizabeth M. York, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.

27