NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1091. SAUNDERS v. THE STATE.

LAGRUA, Justice.

Appellant Eptwarnd Saunders appeals his conviction for malice murder related to the shooting death of James Jones.[1] On appeal, Saunders argues that his conviction should be reversed because his trial counsel was constitutionally ineffective in several respects and because the trial court abused its discretion by denying his motion for new trial on the general grounds. For the reasons that

_____

[1] Jones was shot and killed on January 29, 2018. On December 4, 2018, a Liberty County grand jury indicted Saunders for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); and aggravated assault (Count 3). Saunders was tried from November 29 to December 2, 2021, and the jury found him guilty on all counts. The trial court sentenced Saunders to life without the possibility of parole on Count 1 (malice murder), and the remaining counts merged or were vacated by operation of law. Saunders filed a timely motion for new trial, which he later amended through new counsel on January 19, 2023. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on February 7, 2025. Saunders filed a timely notice of appeal on March 7, 2025. The case was docketed in this Court to the August 2025 term and submitted for a decision on the briefs.

follow, we affirm Saunders's conviction and sentence.

The evidence presented at trial demonstrates that, shortly before 3:30 p.m. on January 29, 2018, Ashley Rye was traveling along Freedman Grove Road in Liberty County when her car "started acting up," so she pulled over and exited her vehicle. When Rye got out of the car, she heard a gunshot and saw a man wearing "a red sweater or a hoodie" and blue jeans running out of the driveway of a nearby house. A few minutes later, several witnesses, including a school bus driver, were driving separately down Freedman Grove Road when they noticed a pickup truck parked in the driveway of a house at 790 Freedman Grove Road with the driver-side door open and "a large man" lying "face down" on the ground just outside the truck in "a large pool of blood." The school bus driver soon encountered a Liberty County Sheriff's deputy parked along the side of Freedman Grove Road, to whom she reported what she saw, and the sheriff's deputy responded to the scene, observed the man's body in the driveway, and requested back-up and the assistance of emergency medical services.

2

Investigators with the Liberty County Sheriff's Office soon arrived on the scene and identified the deceased man as Jones. The medical examiner testified that Jones died from "a shotgun wound to the neck." Jones's truck was still running, and inside the vehicle, investigators observed blood spatter on the interior side of the driver-side door and a pool of blood at the base of the driver's seat. No weapons were found at the scene, and the murder weapon was never recovered.

Investigators recovered Jones's cell phone from the driver's seat of the truck. A subsequent search of that phone established that, between January 26 and 29, 2018, multiple calls were placed from or received by Jones's cell phone from the same phone number—later identified as Saunders's cell phone number—including nine calls on January 29. The last phone call to Jones's cell phone—an incoming call from Saunders's cell phone—was received at 2:58 p.m. on January 29. When investigators later seized and searched Saunders's cell phone pursuant to a search warrant, they discovered that most of the call history between Jones's and

3

Saunders's cell phones from January 26 to 29 had been deleted from Saunders's call history. However, in the internet search history on Saunders's cell phone, investigators noted several searches for law enforcement information, news articles, and media coverage related to Jones's death, beginning on January 31. Additionally, the cell phone records for Saunders's cell phone demonstrated that between 3:22 p.m. and 3:31 p.m. on January 29, Saunders's cell phone pinged off a cell tower located close to the Freedman Grove Road area where Jones's body was discovered.

Saunders was employed at a diner that Jones visited regularly. Surveillance videos from the diner showed that Saunders arrived for work around 6:30 a.m. on January 29, wearing "a red sweatshirt" and blue jeans. The surveillance videos also established that Jones briefly visited the diner around 8:30 a.m. on January 29. Freddy Easley, another employee of the diner, testified that he and Saunders generally worked at the diner from "opening in the morning until closing" at 2:30 p.m., and on January 29, Saunders was still at work when Easley left at 2:15 p.m. Another employee,

4

Douglas Saxxon, testified that he gave Saunders a ride home after their shift on January 29, dropping Saunders off at home between 2:35 and 2:37 p.m.

Around 3:00 p.m. that afternoon, Jones's brother, Moses, saw Jones driving around town in his truck, and Moses testified that Jones "had somebody in the truck with him." Saunders's aunt, Myrtle Jones—who has no relationship to the victim—testified that, between 3:30 and 4:00 p.m. on January 29, she was visiting her sister at 1067 Freedman Grove Road[2] when Saunders showed up, "sweaty," saying he was waiting on a ride. Myrtle testified that she offered to give Saunders a ride home, which he accepted. As Myrtle turned onto Freedman Grove Road from her sister's house to drive Saunders home, "a school bus passed by," and shortly down the road, the bus pulled over and stopped beside a police car that "was sitting on the other side" of the road.

---

[2] The record reflects that 1067 Freedman Grove Road is approximately 1500 feet from 790 Freedman Grove Road, where Jones's body was discovered.

Easley testified that, a little after 4:00 p.m. on January 29, he picked Saunders up at Saunders's house, and they went to hang out with some friends. Around 5:30 p.m., Easley and Saunders went to Easley's camper, and Easley started a fire to burn a pile of pine straw. Easley testified that Saunders threw the "red sweatshirt" he had worn that day into the fire. Around 6:30 p.m., Easley and Saunders left the camper and drove around for a couple hours. During the drive, Saunders told Easley that he had killed Jones, saying "I blew his damn head off."

Saunders was arrested for Jones's murder on February 5, and after being advised of and agreeing to waive his *Miranda*[3] rights, Saunders was interviewed by investigators. During his interview, Saunders admitted to calling Jones at 3:00 p.m. on January 29, but insisted that he did not see Jones that afternoon and was not in the vicinity of Freedman Grove Road. At the time of his arrest, Saunders consented to providing a sample of his DNA, and Saunders was later

---

[3] See *Miranda v. Arizona*, 384 US 436 (1966).

determined to be "the major contributor" of DNA found on the "front interior handle" of the passenger-side door of Jones's truck.

Saunders testified on his own behalf at trial, and on cross-examination, he conceded he was in the Freedman Grove Road area on the afternoon of January 29. Saunders testified that, after Saxxon took him home on January 29, Saunders went over "to meet this guy that stayed on the corner of Freedman Grove" to sell him some marijuana. According to Saunders, while he was on Freedman Grove Road, he saw a sheriff's deputy, and because Saunders had drugs on his person, he decided not to meet "this guy" to complete the drug transaction. Saunders stated that he kept going down Freedman Grove Road until he reached Myrtle's house, which was "a ways down" from where Jones's body was found. Saunders said he went home after seeing Myrtle, insisting he did not see or interact with Jones during that timeframe.

1. In his first enumeration of error, Saunders contends that his trial counsel was constitutionally ineffective in a number of respects, citing the standard of review for an ineffective-assistance-of-counsel

claim under *Strickland v. Washington*, 466 US 668, 687 (1984), and reciting several acts or omissions of his trial counsel that purportedly reflect "how defense counsel conducted himself during his representation of Saunders." However, Saunders only presents argument and citations to authority on two ineffectiveness claims—a claim relating to his trial counsel's refusal of an alibi instruction and a claim relating to his trial counsel's referral to Saunders as an "ex-convict" during opening statement—both of which fail under the deficiency prong in *Strickland*. As to the other claims, Saunders did not include any supporting argument or citations to authority to demonstrate how trial counsel's acts or omissions amounted to deficient performance or prejudiced the outcome of Saunders's trial. As such, Saunders has abandoned most of his ineffectiveness claims. See *Byrd v. State*, 321 Ga. 222, 225 (2025) (holding that "litigants must do more than just make an argument or cite authority, but must now ensure that argument, citation to authority, and citation to the record are all present to avoid having an enumeration deemed abandoned"). See also Ga. Sup. Ct. R. 22(1).

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2021) (citing *Strickland*, 466 US at 687–95). "In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous." *Winters v. State*, 305 Ga. 226, 230 (2019).

"To prove deficient performance, a defendant must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Nesbit v. State*, 321 Ga. 240, 246–47 (2025) (quotation marks omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Id. at 247 (quotation marks omitted). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the

9

absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (quotation marks omitted).

(a) Saunders first contends that his trial counsel performed deficiently in refusing the trial court's offer of a jury instruction on alibi because Saunders provided an alibi defense at trial by asserting that "he was miles away from where Jones'[s] body was found." Saunders's claim fails.

At the hearing on Saunders's motion for new trial, Saunders's trial counsel testified that he did not ask for an alibi instruction and declined the trial court's offer to give such an instruction because (1) "there was no alibi"; (2) alibi was not Saunders's "theory of defense"; (3) trial counsel did not want to "mislead" the jury by alleging alibi when Saunders had ultimately testified at trial that "he was actually on the same road as where the murder occurred," albeit for purposes of "selling marijuana to somebody" in that area; and (4)

10

trial counsel did not want the alibi instruction to be "used against [Saunders] in deliberation." Saunders's trial counsel emphasized that "[t]here was no need for [an alibi] instruction" here because Saunders's defense was "actual innocence" and "insufficient evidence" to prove his involvement in Jones's murder "beyond a reasonable doubt," not alibi.

On appeal, Saunders bears the burden of showing that his trial counsel's actions were "objectively unreasonable" under the circumstances. *Nesbit*, 321 Ga. at 246. And, here, Saunders has not shown that his trial counsel performed in an "objectively unreasonable way" in declining the alibi instruction, id., especially in light of Saunders's trial testimony that he was in the area where Jones was shot around the time of the murder. See *Blalock v. State*, 320 Ga. 694, 705 (2025) (concluding that trial counsel's strategic decision not to present an alibi defense was not deficient performance where evidence was conflicting regarding alibi and counsel had concerns about the strength of such a defense). As such, this claim fails.

(b) Saunders also argues that his trial counsel performed deficiently by describing Saunders as an "ex-convict" in his opening statement. In support of this claim, Saunders asserts that, although he could not find "a similar case where defense counsel made a similar statement" and although his trial counsel's statement was not itself evidence, "the jury certainly could not ignore" trial counsel's statement, and that statement negatively impacted the outcome of Saunders's trial. This argument is unavailing.

During Saunders's opening statement, his trial counsel stated the following to the jury: "My client[,] Mr. Saunders, is an ex-convict. He has served time in jail. He knows the importance of having a lawyer. But … during this investigation of Mr. Jones, my client, Mr. Saunders, did not ask for an attorney. He cooperated. He talked to the police." Saunders's trial counsel also told the jury that Saunders was gainfully employed, was married, and was a father, and that he willingly spoke to police and provided a sample of his DNA.

At the motion-for-new-trial hearing, Saunders's trial counsel explained that he advised the jury that Saunders was an "ex-

convict" because trial counsel "had to take into consideration that … the State had convictions of Mr. Saunders from North Carolina," and trial counsel thought that Saunders would likely testify at trial, in which case "those convictions could be used to … impeach him." For that reason, trial counsel's strategy was to mention Saunders's past convictions to the jury before the State could present evidence of those convictions at trial, which trial counsel believed would help mitigate the harm to Saunders.

To determine whether trial counsel's performance "fell within a wide range of reasonable professional conduct," we examine the "reasonableness of counsel's conduct … from counsel's perspective at the time of trial and under the particular circumstances of the case." *Collins v. State*, 276 Ga. 726, 727–28 (2003) (quotation marks omitted). We have said that, when a defendant's trial counsel places "damaging information" about the defendant's prior convictions before the jury during opening statement or direct examination "in an attempt to portray [the defendant] as a truthful man with nothing to hide … rather than risk having the information extracted

13

from him on cross-examination," this strategy can be a reasonable one. Id. at 728.

Here, Saunders's trial counsel testified that he mentioned Saunders's prior conviction during opening statement because he knew Saunders intended to testify at trial and could be impeached with evidence of his prior conviction by the State. Such a strategy was reasonable under the circumstances, as it can be reasonable for trial counsel "to place disagreeable information before the jury in a manner which he can control rather than allow the subject matter to be presented in a more damaging fashion." *Terry v. State*, 284 Ga. 119, 122 (2008) (holding that the defendant's trial counsel was not deficient for remarking during his opening statement that, "yes [the defendant] was out there pimping," because trial counsel knew the evidence would show the defendant was regularly engaged in pimping). See also *Phillips v. State*, 285 Ga. 213, 218–19 (2009) (concluding there was no deficient performance where the defendant's trial counsel failed to object to the prosecutor's remarks during the opening statement that the defendant was a convicted

14

felon because trial counsel knew that the defendant intended to testify at trial, which would subject the defendant to impeachment by the introduction of his prior felony convictions). Therefore, this ineffectiveness claim also fails.

2. Saunders also contends that the trial court abused its discretion by denying Saunders's motion for new trial on the "general grounds" under OCGA §§ 5-5-20 and 5-5-21. "Those Code sections allow a trial court, on a motion for new trial, to reverse a conviction if the conviction is 'contrary to evidence and the principles of justice and equity,' OCGA § 5-5-20, or 'decidedly and strongly against the weight of the evidence,' OCGA § 5-5-21." *Anderson v. State*, 319 Ga. 56, 60 (2024). We have held that, "[w]hen these so-called general grounds are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a thirteenth juror," and "[s]itting as the thirteenth juror requires the judge to consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence." *King v. State*, 316 Ga. 611, 616 (2023) (cleaned up). But

15

"the merits of the trial court's decision on the general grounds are not subject to our review, and the decision to grant a new trial on the general grounds is vested solely in the trial court." Id. (cleaned up).

In the order denying Saunders's motion for new trial, the trial court concluded that the evidence was sufficient beyond a reasonable doubt to find Saunders guilty of the charges against him and that the weight of the evidence supported the verdict. The trial court also concluded that, "[a]fter due consideration of any conflicts in testimony or conflicts in evidence and weighing all the evidence, this Court, exercising its discretion as the 'thirteenth juror,' declines to overturn the verdict."

"Absent affirmative evidence to the contrary—and there is none here—we presume that the trial court properly exercised its discretion in denying a motion for new trial on the general grounds." *Anderson*, 319 Ga. at 60. Accordingly, Saunders's claim "is not subject to review on appeal." *Sinkfield v. State*, 318 Ga. 531, 540 (2024).

*Judgment affirmed. All the Justices concur.*